**IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

UNITED STATES OF AMERICA


V.                                                        No. 25-cr-20326-TLP


KALEB DESHUN BOOKER,
      DEFENDANT

---

**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE FROM
SEARCH WARRANT 25-SW-216**

---

The Defendant, Kaleb Deshun Booker, moves this Court to suppress electronic data

obtained via search warrant 25-SW-216.  The evidence was obtained in violation of Mr. Booker's

Fourth Amendment rights, as the search warrant failed to establish probable cause as required by

law.

**PROCEDURAL HISTORY**

Mr. Booker is charged with several offenses in this case.  In Counts 1 and 2, he is charged

with Carjacking, in violation of 18 USC § 2119.  In Count 3, he is charged with Bank Robbery, in

violation of 18 USC § 2113(a).  In Counts 4 and 5, he is charged with Unlawfully Transporting in

Interstate Commerce a Stolen Motor Vehicle, in violation of 18 USC § 2312.  In Count 6, he is

charged with Kidnapping, in violation of 18 USC § 1201(a)(1).  (*see* First Superseding Indictment,

ECF No. 37)

Counts 1 and 4 stem from November 2024 and involve victim "C.C."  Counts 2, 3, 5, and

6 stem from April 2025 and involve victim "M.C."

On November 10, 2024, "C.C." reported to police that he was carjacked while he was sitting in his car. C.C. reported that the subject took his car and phone at gunpoint, and then fled the area. C.C.'s vehicle, a 2014 BMW 435, was found in Mississippi on November 18, 2024. Law enforcement reports indicated that Mr. Booker's fingerprints were found on or within the vehicle.

On April 30, 2025, "M.C." reported to police that he planned to meet in person with someone that he met via the Grindr app. When M.C. arrived at the designated meeting location, he was threatened at gunpoint by an unknown person. This person forced him to drive around for a period of time and forced M.C. to withdraw money from a Regions Bank ATM. Eventually, M.C. was told to drive to an apartment complex, and his 2017 Honda Civic and cell phone were taken. On May 1, 2025, Mr. Booker was arrested in Atlanta, Georgia, while driving the stolen Civic. Mr. Booker is alleged to have fled from the police but was eventually apprehended. Two cell phones were found in the stolen Civic.[1] Mr. Booker later was interviewed by Memphis Police detectives, and he told the officers that his phone number was 901-600-4992. The two cell phones found had phone numbers 901-600-4992 and 409-651-6485. Mr. Booker also told detectives that he had not been to Memphis since February 15, 2025, and stated that he purchased the stolen Civic from someone in Georgia.

Law enforcement also questioned Mr. Booker about the November 10, 2024, carjacking of C.C. Mr. Booker told detectives that he had purchased the BMW 435 from another person.

---

[1] From the discovery materials provided by the United States, it does not appear that M.C.'s cell phone was in the Civic and it is unclear whether M.C.'s cell phone was ever found.

**The Search Warrant at Issue**

On August 4, 2025, law enforcement obtained a search warrant for "Info. associated with Meta Facebook account KB." The search warrant was signed by the Honorable Tu M. Pham, Chief United States Magistrate Judge.

The probable cause affidavit discusses the April 30, 2025, incident, but *makes no mention of the November 1, 2024, incident.*

The affiant reveals that, as part of the investigation, M.C. said that he exchanged information with someone named "Alvin" on the Grindr app.  M.C. showed investigators a picture of the person he knew to be "Alvin."  During an interview with Kaleb Booker, Mr. Booker was shown a picture of "Alvin" and said that he knew this person as "Chris", a well-known photographer in Memphis.  Later, investigators looked at Kaleb Booker's publicly accessible Meta/Facebook page and saw that he was Facebook friends with "Alvin/Chris", whose profile name was "Cmoney Wavy."  The affiant alleges that he suspects that Mr. Booker used the photograph of "Alvin/Chris" on a Grindr account in order to lure victims to be robbed.

The search warrant sought essentially the entire Facebook account of Mr. Booker in order to "further prove Booker's intentions and may reveal additional evidence for the ongoing criminal investigation."  In addition, the affiant states that

19.    It is my experience that many suspects use Facebook messenger and Meta Platforms, Inc. phone calls to communicate with each other before, during and after a crime. It is known that individuals involved in criminal activity heavily utilize Facebook messenger and Meta Platforms, Inc. phone calls to communicate with one another. Moreover, Meta Platforms, Inc. retains users Internet Protocol (IP) address when they log into or out of Facebook.

In addition, the affiant requests information related to Mr. Booker's Meta/Facebook account, asserting the following justifications:

36.    As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can

indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

The search warrant seeks Meta/Facebook data from November 1, 2024, through May 15, 2025.  Included are requests for all contact and personal identifying information, all activity logs, all photos and videos uploaded, all profile information, all records or other information regarding the devices and internet browsers associated with the user ID, in addition to other requests.

## LEGAL ARGUMENT

### Search Warrant 25-SW-216 was not supported by probable cause

"The Fourth Amendment requires that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Probable cause is a "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Abboud*, 438 F.3d 554, 571 (6th Cir. 2006) (quoting *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir. 1995)). A "neutral, disinterested" judge may issue a warrant that "particularly describe[s] the things to be seized, as well as the place to be searched," so long as "those seeking the warrant ... demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense." *Dalia v. United States*, 441 U.S. 238, 255 (1979) (citation modified). Under traditional probable cause analysis, the affidavit in support of a warrant must, under the "totality of the circumstances," lead a "reasonable and prudent" person to believe there is a "fair probability" that "contraband or evidence of a crime" will be found in a particular place. *Florida v. Harris*, 568 U.S. 237, 243-44 (2013) (quotation omitted). And because a magistrate judge's initial determination of probable cause receives "great deference," reviewing courts ask only whether the magistrate had a "substantial basis" for believing that the warrant satisfied the probable cause requirement. *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000) (en banc).

The mandate of interrelation "between the place to be searched and the evidence sought" is known as the "nexus" requirement. *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc) (quoting *United States v. Van Shutters*, 163 F.3d 331, 336-37 (6th Cir. 1998)). "The affidavit must establish a nexus ... such that there is a substantial basis to believe that the things to

be seized will be found in the place searched." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010).

Modern cell phones present unique challenges for courts analyzing the nexus requirement. After all, "our phones frequently contain information chronicling our daily lives—where we go, whom we see, what we say to our friends, and the like." *United States v. Griffith*, 867 F.3d 1265, 1268 (D.C. Cir. 2017). As a result, a suspect's phone "can serve as a fruitful source of evidence, especially if he committed the offense in concert with others whom he might communicate about it." *Id*. But the "pervasiveness" of cell phones distinguishes them from the "physical records" that animate traditional probable cause jurisprudence. *Riley v. California*, 573 U.S. 373, 395 (2014). Cell phones keep "a digital record of nearly every aspect of [our] lives" and are "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." *Id*. at 385, 395. Until the widespread use of cell phones, "people did not typically carry a cache of sensitive personal information with them as they went about their day." *Id*. at 395.

There are two potential nexus standards in the cell phone context. See *United States v. Rolling*, No. 23-1045, 2024 WL 4512532, at *3 (6th Cir. Oct. 17, 2024). One standard would require an affidavit to make "factual allegations" that the "[cell] phone [to be searched] itself is being used in connection with criminal activity." *Id*. at *3 (emphasis added) (quoting *United States v. Sheckles*, 996 F.3d 330, 338 (6th Cir. 2021)). An alternative standard mirrors the traditional probable cause inquiry, requiring an affidavit to allege a "fair probability" the phone "will aid in a particular investigation" and "disclose evidence of criminal activity." *Id*.

In the instant case, there is no nexus between the crimes and the information sought by law enforcement. First, the search warrant does not even mention the November 2024 incident. In the

April 2025 incident, all of the information that law enforcement obtained against Mr. Booker was found in a search of publicly accessible Facebook accounts or during the interrogation of Mr. Booker. In addition, the affiant states that many suspects use Facebook messenger to communicate with each other before, during and after a crime. While this general assessment may be true, there is no specific information provided by the affiant as to how that may apply to *this particular case.* If such a vague and generalized statement established probable cause for a search, then it is hard to imagine any scenario in which that statement would not meet the probable cause standard. "While an officer's 'training and experience' may be considered in determining probable cause, it cannot substitute for the lack of evidentiary nexus in [a] case." *United States v. Schultz*, 14 F.3d 1093, 1097 (6th Cir. 1994). "With due regard for [an officer's] experience, an officer's training and experience alone are no substitute for the required evidentiary nexus between criminal activity and the place to be searched." *United States v. Pope*, 330 F. Supp. 2d 948, 956 (M.D. Tenn. 2004) (citing *Schultz*, 14 F.3d at 1097). It is unreasonable for the affiant to request all data from the iCloud accounts when there is no evidence that the suspect used any other apps or information on iCloud accounts during the crimes.

Even if the Court finds that the search warrants satisfy the nexus requirement, the sheer overbreadth of the requested data gives the Court an additional reason to suppress any evidence obtained from the Facebook/Meta account. As stated above, the four corners of the search warrant and accompanying affidavit do not even mention the November 2024 incident. Yet the search warrant seeks data from the period of November 1, 2024, through May 15, 2025, a period of approximately seven months. In addition, the warrant seeks essentially all data associated with the Facebook/Meta account with claims that it "could help" investigators identify "potential patterns, associates, or planning behavior relevant to both carjackings and related crimes." There

is no evidence in the affidavit that allege that Mr. Booker had any associates assisting him during his alleged crimes.

**The _Leon_ "good faith" exception does not apply**

Nor can the government rely on _Leon_ to salvage the search warrant at issue in this particular motion.  In _United States v. Leon_, 468 U.S. 897 (1984), the Supreme Court "created the so-called 'good faith' exception to the exclusionary rule for evidence seized in 'reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" _United States v. Ward_, 967 F.3d 550, 554 (6th Cir. 2020). But _Leon_ also cautioned that there are limits to what may be deemed "reasonable, good-faith reliance." Specifically, the exclusionary rule should continue to apply if "'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization.'" _Id._ (quoting _Leon_, 468 U.S. at 922 n.23). The _Leon_ decision "identified four specific situations in which an officer's reliance on a subsequently invalidated warrant could not be considered to be objectively reasonable." _United States v. Laughton_, 409 F.3d 744, 748 (6th Cir. 2005). These situations arise: "(1) when the warrant is issued on the basis of an affidavit that the affiant knows (or is reckless in not knowing) contains false information; (2) when the issuing magistrate abandons his neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and, (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid." _Id._ (citing _Leon_, 468 U.S. at 914–923).

The third _Leon_ situation applies here.  The affidavit contains no indicia of probable cause and instead speculates that, if officers are allowed to search the Facebook/Meta account, they may find additional evidence that incriminates Mr. Booker in these crimes.  Also, the warrants seek all iCloud data from a seven month period of time while only referencing one crime that was

committed on April 30, 2025.  The sheer overbreadth of the information requested (both in time and in volume) reveal the unreasonable nature of the request.  Had the warrant requested only Grindr data from the day of the offense, the Court would likely find that the warrant was valid since it was limited in scope.  Essentially, the affiant here is asking to have *carte blanche* to look through Mr. Booker's personal information when it is not related to the alleged crimes in any way.

WHEREFORE, Mr. Booker requests that the Court suppress all iCloud information obtained from search warrants 25-SW-209 and 25-SW-210.

RESPECTFULLY SUBMITTED,

s/Greg Gookin
Greg Gookin, TN BPR #023649
Assistant Federal Defender
200 Jefferson Avenue, Suite 200
Memphis, TN  38103
(901) 544-3895

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing motion on Ms. Eileen Kuo, Assistant United States Attorney, via the Court's electronic filing system, this 23rd day of April, 2026.

s/Greg Gookin
Greg Gookin
Assistant Federal Defender